### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

Cause No.: 1:22-cv-01047-LY

| | |
|---|---|
| DAVID E. O'CONNOR,<br>    Plaintiff-Petitioner,<br><br>v.<br><br>STATE OF TEXAS, et al.,<br>    Defendants-Respondents. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

FORMAL DEMAND FOR JURY TRIAL

CONSTITUTIONAL CHALLENGES

INJUNCTIVE RELIEF REQUESTED

### Motion to Strike Sealed Forensic Custody Evaluation Document

Comes now the Plaintiff-Petitioner, David E. O'Connor, pursuant to FRCP Rule 12 (f) MOTION TO STRIKE. The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act:(1) on its own; or (2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading.

"We conclude that the District Court had jurisdiction to grant the motion to strike pursuant to its inherent powers. The inherent powers are mechanisms for "control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases. *Ready Transportation, Inc. v. AAR Manufacturing, Inc., 627 F.3d 402 (9th Cir. 2010)*" quoting Chambers, 501 U.S. at 43, 111 S.Ct. 2123 (citations omitted).

"It is well established that `[d]istrict courts have inherent power to control their docket.'" *Atchison, Topeka & Santa Fe Ry. v. Hercules, Inc., 146 F.3d 1071, 1074 (9th Cir.1998)* (alteration in original) (quoting *Hernandez v. City of El Monte, 138 F.3d 393, 398 (9th Cir.1998))*. This includes the power to strike items from the docket as a sanction for litigation conduct. Looking at the specific grounds for striking, " '[i]mmaterial' matter is that which has no essential or important relationship to the claim for relief or the

defenses being pleaded, or a statement of unnecessary particulars in connection with and descriptive of that which is material."Wright & Miller, supra, at § 1382.

ARGUMENT

The sealed document includes the " Forensic Custody Evaluation  " by Alissa Sherry Ph.D **(DR 19 Exhibit #1)**  released on January 21 2022 to the parties  six weeks after the recusal of District Judge   Catherine A. Mauzy , a known   social friend of Alissa Sherry. A subsequent expert    review  of  the  report  revealed  that  the  report  was/is volitionally fraudulent, biased , scurrilous and   a" character assassination " not within the standard of care  in  the  field.**( Exhibit A and B)**  The  evaluation  and  report  was/ is    in   violation   of the   Texas Administrative Code Title 22 Examining Boards Part 21 Texas  State  Board  of Examiners of  Psychologists  Chapter  465 Rules  of   Practice, Texas   Family  Code  and the  specific Agreed Order  for Child  Custody Evaluation.

The Plaintiff-Petitioner is a valid witness that the narrative was/is  fraudulent and not supported by the documentation, was/is contrary to the objective psychological testing for both parties and there are several fabrications by Alissa Sherry. The defendant Alissa Sherry has a history of such behaviors with prior litigants , multiple state psychology board complaints and successful litigation against her. Her personal and professional social media posts contained material indicating a pre-existing biases and affiliations  which she deleted after its discovery during the state litigation process. She has attempted to coerce  litigants to  disregard federal constitutional protections for her benefit and violation of her fiduciary duty as a private entity symbiotic with state agents.    But the above is equally irrelevant, as a valid forensic evaluation  would be  , to the Plaintiff - Petitioner's pleadings in this U.S. district court.

The  "Forensic  Custody  Evaluation"  was  previously  released  as  public  record when electronically filed by Defendant Trish Ho 's *Motion for Temporary Orders* and *Amended   Motion  for  Interim Fees*  on  February  9,  2022.

The evaluation as exhibits to the above titled were filed with this court as supplement **( DR 28 Suppl 104-105)** to the state court records upon this court's request for the state court records and prior to the Order entered to seal **(DR 32)**. Therefore the defendant's submitted document is duplicative or redundant. The request to admit under seal the Forensic Custody Evaluation was a legal maneuver by the Defendant Trish Ho through her attorney, Eric R. Little, to bias the court through review of the document. This document submitted by both parties has no relevance to the current pleadings. The Plaintiff's pleading was specifically regarding constitutional violations and not state case specific.

"Striking a pleading is generally disfavored, and it is a drastic remedy to be resorted to only when required for the purposes of justice [and] should be granted only when the pleading to be stricken has no possible relation to the controversy." *Spoon v. Bayou Bridge Pipeline, LLC, 335 F.R.D. 468, 470 (M.D. La. 2020; Coney, 689 F.3d at 379)* "Although motions to strike are disfavored and infrequently granted, striking certain allegations can be appropriate when they have no possible relation to the controversy and may cause prejudice to one of the parties." *Id., quoting American S. Ins. Co. v. Buckley, 748 F.Supp.2d 610, 626-27 (E.D. Tex. 2010);* "Any doubt about whether the challenged material is redundant, immaterial, impertinent, or scandalous should be resolved in favor of the non-moving party." *Wright & Miller, supra, at § 1382.*

In addition, the filing of the document was to wrongly influence the understandably unknowing court by the fraudulent report on its face. Such motions generally are not granted unless the movant shows it has been prejudiced *Coco v. United States, 569 F.2d 367, 372 (5th Cir. 1978;" Niblo, 821 F. Supp. at 449.*

The fact that the document was filed under order to seal **(DR 32 )** several days after a motion to seal was filed **( DR 17 )** indicates this court's timely consideration and belief that the document is in fact "valid enough" to be sealed and thus there is possibility of

prejudice **(DR 32 P 2)** . In addition , Magistrate Judge Lane stated specifically in his "REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE " *The undersigned further notes that in the underlying case, defendant Dr. Sherry, the state court-appointed psychologist who performed a forensic custody evaluation, recommended that O'Connor be required to pay an attorney fee litigation bond in the amount of $50,000 given the extent to which he has harassed Ms. Ho with needless litigation and court expenses. Dkt. #19-1 at 77. Indeed, in this removal and motion practice, O'Connor has exhibited many of the behaviors that Dr. Sherry found so abusive.."(notation omitted )***(DR 48 P 8 )** . It is clear that the fraudulent report on its face influenced Judge Lane's perception of the removal filings by the Plaintiff - Petitioner without the opportunity for a due process 'voir dire' of the report in this instant court. It is reasonable to question whether the report inspired a search for validating statements in this Plaintiff-Petitioner's pleadings to support the unfounded comments of the defendant , Alissa Sherry , thus confirming the bias of the report. Similar appraisals were not noted in separate but similar removal cases as cited by Mr. Graydon. **( DR 29 P 8 notation 3)**

In addition, the defendant Trish Ho through and her attorney, Eric R. Little were completely knowledgeable that the the Forensic Custody Evaluation was fraudulent and scurrilous. The attachment of the report to a motion by Eric R. Little was/is therefore an egregious sanctionable action such as perjury to this court as the defendant Trish Ho through her prior attorney, the defendant Marshall Thompson were previously informed and knowledgeable of the fraudulent nature of the report during the state case and committed the egregious sanctionable act of filing a fraudulent document with their prior motions without any accountability to the potential damage of the document.

CONCLUSION

Plaintiff-Petitioner moves the court to Strike the document titled " Forensic Custody Evaluation"**(DR 19 Exhibit 1)** and documents submitted by Plaintiff - Petitioner **DR 28 Suppl 104-105**. This   document -as well as the additional state court documents -is not relevant to the instant case as it is a fraudulent report and process , and was filed for improper purpose to bias this court by the defendant Trish Ho through her attorney Eric R. Little.   In addition, the   report was previously placed in the public record in the state court case under the direction of the defendant Trish Ho through her attorney,  and also filed by the Plaintiff - Petitioner upon request of this court as part of the state court records and is not material to the Petitioner 's pleadings to this court and is redundant.

WHEREFORE

Plaintiff-Petitioner, David E. O'Connor, moves the Court to   Strike   the Forensic Custody Evaluation Report  and  award Sanctions against defendant , Trish Ho and her representing attorney , Eric R. Little to the limit the law allows.

AFFADAVIT OF VERIFICATION

Now hereby I , the affiant David E. O'Connor, do declare that the above  facts are true and correct to the best of my information and belief and hereby  verify, certify and state, pursuant to the penalties of perjury under the laws of the United States, and by the provisions of 28 USC§ 1746, that all of the above and foregoing representations Cedar Park, Texas , Williamson County , upon this 13th day of  January 2023 .

Respectfully submitted,
/s/ David E. O'Connor /s/

_____

David E. O'Connor
307 Angus Drive
Cedar Park, TX  78613
Plaintiff-Petitioner Party of Record

CERTIFICATE OF SERVICE

I hereby certify:   that on this 13th_ day of January 2023, a true and complete copy

the above *Motion to Strike Sealed Forensic Custody Evaluation Document,* was served by

ECF system unto parties whose counsel have entered their digital appearances herein, has

been duly served upon:

*(Cross-Defendant State of Texas)*
c/o Scot M. Graydon, SBN 24002175
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, TX  78711-2548

*(Cross-Defendant Thompson etc.)*
Thompson, Salinas & Londergan
c/o Michael B. Johnson, SBN 24029639
Thompson Coe Cousins & Irons
2801 Via Fortuna, Suite 300
Austin, TX  78746

*(Cross-Defendants Soifer and Crump)*
c/o Anthony J. Nelson, SBN 14885800
Assistant County Attorney
Travis County Attorney's Office
P.O. Box 1748
Austin, TX  78767

*(Counter-Defendant Trish Ho)*
c/o Eric R. Little, SBN 24014596
Law Office of Eric R. Little
219 Texas Avenue
Bacliff, TX  77518

*(Cross-Defendant Dalrymple etc.)*
Dalrymple, Shellhorse, Ellis & Diamond
c/o Mike F. Pipkin, SBN 16027020
Weinstein Radcliff & Pipkin
8350 N. Central Expressway, Suite 1550
Dallas, TX  75206

*(Cross-Defendant Alissa Sherry)*
c/o Leslie A. Benitez, SBN 02134300
Gordon Rees Scully & Mansukhani 901
S. Mopac Expressway
Building 1, Suite 480
Austin, TX  78746

*and*, by depositing same via first class postage prepaid mail, USPS, has been duly served upon:

*(Statutory Intervenor United States)*
c/o U.S. Attorney General Merrick Garland
Office of the United States Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC  20530-0001

*(Statutory Intervenor United States)*
c/o U.S. Attorney Ashley C. Hoff
Office of the U.S. Attorney TXWD
903 San Jacinto Blvd
Suite 334
Austin, TX  78701

/s/ David E. O'Connor /s/
_____
David E. O'Connor

EXHIBIT A

# Business Records Affidavit

STATE OF ___Texas___

COUNTY OF ___Bexar___

Before me, the undersigned authority, personally appeared ___Joann Murphey, Ph.D___,
(Affiant), who first being duly sworn or affirmed by me, under penalty of perjury, deposed as
follows:

1. My name is ___Joann Murphey, Ph.D___. I am over the age of
   18 and fully competent to make this affidavit. The facts stated herein are true and correct
   and are based on my personal knowledge.
2. I am the custodian of the records of ___Joann Murphey, Ph.D___ (business name),
   whose address is ___1202 W. Bitters Rd., Bldg 3, San Antonio, Texas 78216___.
3. Attached hereto, collectively as Exhibit A, are ___6___ pages of records from said
   business, regarding the account of ___David O'Connor___.
4. These said pages of records are kept by said business in the regular course of business.
5. It is the regular practice of said business for an employee or representative with
   knowledge of the act, event, incident, order, transaction, invoice, condition, photo, video
   recording, audio recording, opinion, or diagnosis, to make the record, or to transmit
   information thereof to be included in such record.
6. The said records were made at or near the time of occurrence of the matters set forth
   by, or from information transmitted by, a person with knowledge of those matters.
7. The said records attached hereto are the originals or exact duplicates of the originals.

_____
Affiant's Signature


SUBSCRIBED AND SWORN TO OR AFFIRMED before me on the _20th_ day of
___June___, _2022_ by Affiant ___Joann Murphey___.


_____
Notary Public

_01/02/2023_
My commission expires

GABRIELA A WALSH
Notary ID # 11416657
Expires January 2, 2023

GABRIELA A WALSH
My Notary ID # 11416657
Expires January 2, 2023

EXHIBIT A

# JOANN MURPHEY, Ph.D., ABPP, FICPP

DIPLOMATE IN CLINICAL PSYCHOLOGY ACADEMY OF CLINICAL PSYCHOLOGY

Diplomate Fellow in Psychopharmacology – International College of Prescribing Psychologists

1202 West Bitters; Building 3

San Antonio, Texas 78216-7851

Telephone: (210) 495-0221

Facsimile: (210) 495-0583

E-mail: jmurphey@drjmurphey.com

May 26, 2022

Introduction

Ben Beveridge, attorney for David O'Connor consulted with this psychologist asking her to review a custodial report conducted by Alyssa Sherry and reported on 1/21/2022. The report and hundreds of pages of supporting documentation was then forwarded to this psychologist.

This report identifies problematic issues and shortcomings in the procedures used by Dr. Alyssa Sherry as reported in her child custody evaluation report, in the interest of LTO, heard in Travis County District Court 345. The child is Liam O'Connor. Dad is David O'Connor. Mother is Trish Ho.

Several problem areas are evident in this report concerning Dr. Sherry's procedures in light of applicable rules and regulations. This report concerns only Dr. Sherry's procedural problems and does not reflect any opinion concerning the accuracy of her conclusions and recommendations. This report is not a child custody evaluation.

Personal problems; conflicts of interest; dual relationship

Dr. Alyssa Sherry is a licensed psychologist in the State of Texas and subject to Texas Rules of Practice for Psychologists. As a child custody evaluator, Dr. Sherry also was subject to the various requirements of Texas Family Code Ch. 107.

 Dr. Sherry's evaluation in this case was likely tainted by a prohibited conflict of interest that Dr. Sherry should have known created a likelihood of exploitation or harm to the parties in this custody case, with whom Dr. Sherry had a professional relationship. Texas Rules of Practice for Psychologists at 22 TAC Ch. 465.13 provide as follows:

– Licensees shall refrain from providing services when they know or should know that their personal problems or a lack of objectivity are likely to impair their competency or harm a patient, client, colleague, student, supervisee, research participant, or other person with whom they have a professional relationship.

1

EXHIBIT A

- Licensees shall not exploit persons over whom they have supervisory evaluative, or other authority such as students, supervisees, employees, research participants, and clients or patients.

- A licensee shall refrain from entering into a professional relationship where personal, financial, or other relationships are likely to impair the licensee's objectivity or pose an unreasonable risk of harm to a patient or client.

The following provision in the court order for custody evaluation is inappropriate:

- IT IS ORDERED that during the evaluation process, the parties are enjoined from communicating with, associating with, or conspiring with any individual or organization that has been known to be harassing, defaming, or otherwise attempting to undermine DR. ALISSA SHERRY's practice. This includes any attorneys or individuals associated with these groups, social media, or any media outlet who may attempt to reach out to the parties. These organizations include, but are not limited to Custody Wars, The Austin Bulldog, Texas Association for Children and Families, Family Court Corruption, and Speak Love. If it is discovered that either party has communicated with anyone associated with any of these, or related groups, DR. ALISSA SHERRY will withdraw from your case, your retainer will be forfeited to DR. ALISSA SHERRY, and the judge will be notified in writing of your behavior. The opposing party who has not engaged in such behavior will be entitled to attorney's fees for work associated with the fall out of such behavior by the offending party as well as the reimbursement of fees already paid to DR. ALISSA SHERRY for work performed and retainer that had to be forfeited. Following the evaluation process, the parties are prohibited from providing any part of DR. ALISSA SHERRY's evaluation or file that may have been obtained during discovery to any of these groups or their members.

This provision in the order for custody evaluation most likely was required by Dr. Sherry as a prerequisite for her serving as the court-ordered custody evaluator. Regardless, the provision is an element of the court order for custody evaluation. The provision constrains parties from exercising otherwise protected communications with an undefined and practically unidentifiable scope of individuals or attorneys, for the reason that such individuals may have acted contrary to the business interests of Dr. Sherry.

The scope of this bizarre provision, being undefinable and solely for the protection of Dr. Sherry, creates a *per se* conflict of interest between the parties and Dr. Sherry. The punitive nature of consequences for violating this provision, intentionally or otherwise, creates an apparent risk of harm to a party/client of Dr. Sherry. And if prohibited communication "is discovered" such discovery inures to the sole benefit of Dr. Sherry, who will withdraw as evaluator and take with her the client's retainer funds and other fees paid without having to comply with the custody evaluator's reporting requirements set out in the court order, the Texas Family Code Ch. 107, and the Psychologist's Rules of Practice Rule 465.13.

The provision also contains a forward-looking prohibition against providing "any part" of Dr. Sherry's evaluation to any identified or unidentified group or individual group member who has

EXHIBIT A

acted contrary to the interests of Dr. Sherry and her practice. While no specific punishment is listed for this type of infraction, presumably Dr. Sherry contemplates seeking a contempt finding for violation of the court order.

This objectionable provision of the custody order is designed to protect Dr. Sherry's business interests by constraining speech and association rights of the parties. So, in addition to penalty items, such limitations on the parties' rights are intrinsically harmful to the interests of the parties/clients of Dr. Sherry.

In addition to this inappropriate provision in the court order for custody evaluation, particular contents of Dr. Sherry's report show that her personal problems and lack of objectivity risk harm to her client(s). Texas Rules of Practice for Psychologists at 22 TAC Ch. 465.13 and 465.16 provide as follows:

– Licensees shall refrain from providing services when they know or should know that their personal problems or a lack of objectivity are likely to impair their competency or harm a patient, client, colleague, student, supervisee, research participant, or other person with whom they have a professional relationship.

– Licensees produce reports that clearly state and accurately reflect the scope and purpose of evaluation, assessment, and testing.

– Licensees verify, by signature and date, that every evaluation, assessment, test result, report, recommendation, or psychological diagnostic or evaluative statement produced is based on information and techniques sufficient to provide appropriate substantiation for its findings.

Additionally, the Texas Family Code at Ch. 107.108 & 107.109 require that:

– A child custody evaluator shall follow evidence-based practice methods and make use of current best evidence in making assessments and recommendations.

– A child custody evaluator shall state the basis for the evaluator's conclusions or recommendations, and the extent to which information obtained limits the reliability and validity of the opinion and the conclusions and recommendations of the evaluator, in the child custody evaluation report

– The basic elements of a child custody evaluation … consist of: assessment of the relationship between each child who is the subject of the suit and each party seeking possession of or access to the child.

Dr. Sherry's custody evaluation report offers diagnostic impressions at pp. 60-65. Of these 5+ pages, discussion of Ms. Ho is limited to one paragraph. Dr. Sherry diagnoses her with PTSD based on Ms. Ho's self-report of traumatic experiences in Vietnam, that Dr. Sherry believes were "exacerbated if not partially caused, by Dr. Connor …." Otherwise, Ms. Ho is optimistic, positive, loving, and a good mother.

3

EXHIBIT A

Notably, however, Dr. Sherry's descriptions about Ms. Ho in this regard are inconsistent with inferences from Ms. Ho's MMPI-2-RF profile, keeping in mind the MMPI-2-RF is the only test Dr. Sherry administered with substantial standardization on individuals engaged in child custody litigation. Ms. Ho's MMPI-2-RF profile would describe her as having clinically significant paranoia and thought disorder symptoms. Regardless of the origin of such symptoms, testing indicates they are present, and likely to affect Ms. Ho's interactions with others.

The remainder of the 5+ pages of diagnostic impressions Dr. Sherry devotes essentially to a speculative character assassination of Dr. O'Connor. Dr. Sherry makes the following statements of opinion regarding Dr. O'Connor, opining:

- is cruel, engages in the coercive control of others, is abusive, intimidating, threatening, entitled, and puts his need to hurt others above the needs of his child.

- There are elements of narcissism, borderline, obsessive compulsive, and psychopathic traits in Dr. O'Connor's behavior, particularly in the behavior that was clearly premeditated, calculated, and duplicitous.

- the narcissism is aggressively malicious and is accompanied by additional symptoms of antisocial, paranoid, and sadistic personality traits. This form of narcissism will deliberately damage others in pursuit of their own selfish desires

- Particularly borderline and psychopathic personalities have the capability of succumbing to psychotic processes when under stress

- There is evidence in his testing of poor reality testing and the inability to see things like most others see them. This finding is consistent with projection so intractable it leads to delusional thinking.

- it is highly possible LTO (the child) is an object to him, not a child, and his statements from 2015 simply foreshadow his intent to relentlessly punish her (Ms. Ho) for her decision. LTO best interest was not then, and is not now, driving his behavior. His primary obsession is to control, hurt, and punish Ms. Ho.

Dr. Sherry's statements such as these are at best diagnostically irrelevant and at worst confused and speculative. She basically opines that Dr. O'Connor, who is a high functioning professional psychiatric physician, is delusional and psychotic.

Dr. Sherry's diagnostic impressions of Dr. O'Conner are not based on standardized personality tests that consider child custody litigant standardization samples. Rather, her opinions are based on results of his inkblot test, and on third-party statements largely including complaints of Ms. Ho.

Unexpectedly, Dr. Sherry's report makes no mention of the observed quality of parent child relationships involving the child and his father, his mother, or relatives living with his mother in

EXHIBIT A

the home. Dr. Sherry observed in both parents' homes with the child present, and reviewed collateral statements on the issue. Dr. Sherry's observation notes indicate she interviewed the child at his mother's home and made observations about family interactions in that home.

However, in her notes of her home visit with Dr. O'Connor, Dr. Sherry devoted approximately 5 pages to describing her interrogation of Dr. O'Connor about Ms. Ho's allegations and complaints. Dr. Sherry did not report having observed the child, interviewed the child, or observed interactions between the child and his Dr. O'Connor. The same was true of other notes by Dr. Sherry concerning interviews with Dr. O'Connor. Dr. Sherry's case notes contain no record of observations of the child and Dr. O'Connor. Dr. O'Connor recalls that Dr. Sherry observed the child during this session but did not directly observe the father and child interacting.

Dr. Sherry appears to have made early judgments about these parties based on Ms. Ho's complaints and on third party statements of others who had interactions with the family. She apparently based her conclusions and recommendations concerning the parties exclusively on characteristics of the dysfunctional relationship between Dr. O'Connor and Ms. Ho. It is possible for this reason she did not consider a need to observe the child and Dr. O'Connor interacting.

Even so, Dr. O'Connor provided Dr. Sherry with observation notes from Dr. Warren Farrell, whose resume describes him as a Ph.D. in a sociology-related field with extensive work experience and publications related to parenting issues. Dr. Sherry's records contain 6 video recordings of Dr. Farrell's observations of parent-child interactions between the child and Dr. O'Connor in December 2019, and many pages of accompanying descriptive notes. Dr. Sherry did not mention the content of any of this material in her report. Additionally she did not document any observations and findings about Dr. O'Connor's parent child relations. She appears to have based her conclusions and recommendations solely on the quality of the dysfunctional relationship between Dr. O'Connor and Ms. Ho, along with her exclusive reliance on results of an inkblot test. Her report should have been disqualified.

I reserve the right to amend this report if I am provided with further information that would impact my clinical decisions and conclusions discussed in this evaluation.

Respectfully submitted,

_____
Joann Murphey, Ph.D., ABPP, FICPP

EXHIBIT A

# Joann Murphey, Ph.D., ABPP, FICPP

Diplomate in Clinical Psychology - Academy of Clinical Psychology
Diplomate Fellow in Psychopharmacology - International College of Prescribing Psychologists
1202 West Bitters Rd; Bldg. 3; San Antonio TX, 78216-7851
office: 210•495•0221; fax: 210•495•0383
e-mail: jmurphey@drjmurphev.com

## Education

*Ph.D. in Clinical Psychology* (APA Approved)
University of Tennessee, Knoxville, Tennessee
December 1982

*Ph.D. in School Psychology* (Course work and internship)
University of Tennessee, Knoxville, Tennessee
June 1976

*M.S. in Counseling and Guidance*
University of Tennessee, Knoxville, Tennessee
August 1972

*B.S. in Elementary Education*
University of Tennessee, Knoxville, Tennessee
December 1968

*Founder, American College of Advanced Practice Psychologists*
(Completed coursework equivalent to M.S. degree in psychopharmacology; passed National Examination and all practicum requirements)
September 1998 - February 2001

*The University of Texas Health Science Center at San Antonio*
(Completed requirements for doing competency evaluations)
December 2003

## Professional Clinical Experience

*Private Practice*
September 1983 - present
Provide general outpatient therapy. Particular interests include long-term analytical psychotherapy with adults, child psychotherapy and diagnostics, and family therapy; forensic services.

*Family Counseling Center*
September 1990 - 2008
Provide psychological services - diagnostic and treatment - to families who have completed the adoption process through the Department of Human Resources.

*Family Bridges*
May 2015 - present
Family Bridges is a program for severely alienated children. I am a Certified Workshop Leader and a Certified Aftercare Professional for Family Bridges.

EXHIBIT A

*The University of Texas Health Science Center, San Antonio*
September 1982 - August 1983
Engaged in APA approved internship in clinical psychology (full time). Direct contact work encompassed both children and adults in inpatient and outpatient settings. Adult treatment responsibilities included intake interviewing for diagnostic and treatment planning, psychometric evaluations, individual, marital, family and group consultation and psychotherapy. A variety of treatment modalities were used; generally emphasis was given to insight oriented treatment where applicable. Child treatment responsibilities included intake interviewing for diagnostic and treatment planning, psychometric evaluation, individual, group, and family psychotherapy. Insight-oriented treatment was used while maintaining behavioral measures of evaluation. Treatment settings ranged from the medical school mental health facility to the State Hospital where services for chronic mental health patients were provided.

*Helen Ross McNabb Center, Knoxville, Tennessee*
June 1979 - August 1982
Employed (coordinated by The Univ. of Tennessee) as a clinical associate in an urban community mental health center (20+ hours per week). Obtained direct clinical experience in individual adult and child outpatient psychotherapy, and diagnostic assessment and treatment planning and adult group psychotherapy as well as family therapy.

*Stephen Friedlander, Ph.D., Clinical Psychologist - Private Practice, Knoxville, Tennessee*
June 1981 - August 1982
Administered psychological and neuropsychological assessments for children and adults. Both Reitan and Luria Nebraska batteries were used as well as other tests on inpatient and outpatient populations.

*Little Tennessee Valley Educational Cooperative, Lenoir City, Tennessee*
August 1973 - June 1982
Employed as a school psychologist (full and part time) for an urban school, including development and delivery of psychological services to a school system which had never before used psychological services. Services included preparation of grant applications, psychoeducational assessments of students aged 4 - 21 for placement in various classes and programs, and consultation on emotionally disturbed, learning disabled, intellectually gifted, and other exceptional children.

## Practicum Clinical Training

*University of Tennessee, Knoxville, Tennessee; Psychological Clinic*
September 1980 - August 1982
Practicum spanned two years of training: once a week sessions for three long-term cases with hour-to-hour supervision provided by three clinical psychology supervisors using videotape.

*Lakeshore Mental Health Institute, Knoxville, Tennessee*
September 1980 - June 1981
Assessment practicum that spanned three academic quarters of training in administering full psychological test batteries to inpatient and outpatient populations

## Professional Honors

*Bexar County Psychological Association*
Selected as the BCPA Fellow for the 2006 - 2007 year

EXHIBIT A

*Buros Institute of Mental Measurements*
October 2002 - present
Selected as an independent reviewer of new psychological tests

*State Bar of Texas Grievance Committee*
July 1995 - July 2001
Appointed to sit on a six-member committee to hear grievances filed against local attorneys

*American Board of Professional Psychology Academy of Clinical Psychology*
June 1994 - present
Awarded the rank of Fellow

*American Board of Professional Psychology*
March 1993 - present
Appointed to Examination Committee with primary responsibility to insure the proper examination of applicants for Diplomate status

*American Board of Professional Psychology*
March 1993 - present
Elected to Committee on Work Samples (Primary duty is to develop and implement regulations regarding appropriate work samples for submittal by psychologists seeking Diplomate status)

*Regional Council of the American Board of Professional Psychology*
June 1991 - March 1993
Elected to the Intermountain Regional Council to assist with decision making policies in a 10-state region

*Texas State Board of Examiners of Psychologists*
October 1989 - January 2003
Selected as a private practice professional to supervise, evaluate, or provide psychotherapy to psychologists who have been found guilty of violations of ethical practices, including the review of case files

*The University of Texas Health Science Center, San Antonio*
September 1993 - September 2001
Clinical Assistant Professor with duties of supervising psychology and psychiatry residents on long-term psychotherapy cases and to assist in teaching medical residents in their psychiatry rotation

## Other Professional Experience

*Cedar Bluff Elementary School; Knoxville, Tennessee*
August 1972 - June 1973
School teacher for grades 5 and 6 teaching language arts in a team-teaching setting

*Aberdeen Elementary School; Aberdeen, Maryland*
December 1968 - June 1971
School teacher with full academic teaching responsibilities for a self-contained heterogeneous fourth grade class

EXHIBIT A

## Professional Credentials

- Fellow in the International College of Prescribing Psychologists
- Fellow in the Academy of Clinical Psychology
- Diplomate in Clinical Psychology, American Board of Professional Psychology
- Licensed as a Clinical Psychologist in Texas by the Texas State Board of Examiners of Psychologists, License #2934
- Licensed as a Psychological Examiner in Tennessee by the Tennessee State Board of Examiners of Psychologists, License # P.E. 318, License currently retired while living in Texas
- Tennessee Education Agency - Certified School Psychologist, given Permanent Certification
- Tennessee Education Agency - Certified Elementary School Teacher

## Professional Affiliations (Present or Past)

- American Board of Professional Psychology
- American Psychological Association
- Council for National Register of Health Service Providers in Psychology
- Texas Psychological Association
- San Antonio Psychological Association
- Founder - Texas Psychological Foundation
- Association of Family and Conciliation Courts
- Texas Psychology Political Action Committee
- Founder - American College of Advanced Practice Psychologists

## Doctoral Dissertation

*The Effects of First-Born Siblings on the Gender Differentiation of Second Born Children;* University of Tennessee, 1982

## Professional Papers, Publications, and Presentations

Murphey, J. - *What Expert Do I Need and What Testing Should be Ordered?*, Presentation given at the Texas Criminal Defense Lawyers Association - TCDLA Webinar Presentation Best Practices, February 2021

Brown, J. and Murphey, J. - *Introduction to Psychology: Recalibrating Your Client*, Presentation given at the Family Law Bar Association - San Antonio Back to School CLE Seminar, 1st Annual FLBA-SA Family Law Essentials CLE Seminar, February 2020

Murphey, J. - *"Child Custody Evaluations Under Subchapter D Chapter 107 of the Texas Family Code After March 1, 2016"* Panel Discussion given at the San Antonio Bar Association Extreme Family Makeover XIV., 2016

Murphey, J., *Reintegration Another Model,* Presentation given at the Family Law Section of the State Bar of Texas, October 2015

Murphey, J., *On Phantom Crimes and Secret Science: The "Butner Study" and Child Pornography Sentencing Decisions,* San Antonio Lawyer November-December 2011

EXHIBIT A

Murphey, J., *Expert Testimony in Custodial Evaluations,* Presentation given at the 2010 Texas Academy of Family Law Specialists, February 2010

Murphey, J., *Daubert In Court,* Presentation given at the 2008 Advanced Family Law Seminar, August 2008

Murphey, J., *Daubert In Court,* Presentation given at the 15th Annual Bexar County Children's Court Ad Litem Training Seminar October 2009

Murphey, J., *Expert Testimony in Custodial Evaluations,* Presentation given at the 2009 Texas Academy of Family Law Specialists, January 2009

Murphey, J., *Daubert In Court,* Presentation given at the 2008 Advanced Family Law Seminar, August 2008

Murphey, J., *The Expert,* Presentation given to San Antonio custody evaluators for the Forensic Psychology Advocacy Committee, May 2008

Murphey, J., *Family Custodial Studies with Psychological Testing,* Presentation given at the Extreme Family Law Makeover, February 2008

Murphey, J., *A Checklist for Supervised Access and Quality Care Possession Determinations* Journal of Child Custody, Volume 4, Issue 1/2, 2007

Murphey, J., *Book Review of Divorce Poison,* American Journal of Family Therapy, Volume 31, Number 5, October - December 2003

Ferrell, J. and Murphey, J., *Alternatives to Supervision,* Presentation given to Board Certified Family Practice Attorneys and District Judges, May 2003

Bowles, M., Hollis J. and Murphey, *J., Release of Children's Mental Health Records,* Presentation given for Lorman Education Services, June 2000

Murphey, J., *Personal Empowerment for Women,* Presentation given to the Hills Women's Civic Club, Boerne, Texas, October 1996

Murphey, J., Ferrell, J. and Reid, J., *How to Use (and not Misuse) Psychologists in Child Custody Issues,* Presentation given to Board Certified Family Practice Attorneys, October, 1995

Murphey, J., and Ferrell, J., *Domestic Violence - What are Judges to Do,* Presentation given to San Antonio Civil and Criminal Judges, April, 1995

Murphey, *J., Attorneys - How Can They Improve Their Image,* Presentation given to Texas Border Attorneys, May 1994

Murphey, J., *Child Abuse in South Texas: Third Annual Conference,* Panel participant given in Mock Trial, February 1993

EXHIBIT A

Stedman, J. and Murphey, J., *Dealing with Specific Child Phobias During the Course of Family Therapy: An Alternative to Systematic Desensitization, Family* Therapy, Volume XI, Number 1, 1984

Murphey, J., *Parental Attributes Which Add and Detract from Healthy Ego Functioning in Child Development,* Paper read at the Tennessee Association for Psychology in the Schools, March 1981

Murphey, J., *The Role of the Father in Child Development,* Paper read at the Tennessee Association of Psychologists, November 1980

Murphey, J., *Primary, Secondary, and Tertiary Mental Health Prevention,* Paper read at the Council of Exceptional Children's Annual Meeting, April 1980

Murphey, J., *Clinical and Theoretical Views of Winnicott and Searles: How They Converge and Contrast in the Treatment of Primitive States Such as Schizophrenia,* Paper read at the Tennessee Association for Psychologists, September, 1979

Murphey, J., *Hyperkinetic Children: Treatment Strategies for Professionals and Parents,* Paper read at the National Council of Exceptional Children's Meeting, March 1978

Murphey, J., *Juvenile Hyperkinesis: The Effect of Caffeine,* Paper read at the National Association of School Psychologists Meeting, October, 1978

Murphey, J., *Learning Disabled, Intellectually Retarded and Emotionally Disturbed Children: Diagnostic Similarities and Differences,* Paper presented as Inservice Training to Resource Teachers and Psychologists represented in the Little Tennessee Valley Educational Cooperative, October, 1977

Murphey, J., *Lying and Stealing Behaviors in Children: Differentiating Normal from Pathological Responses,* Paper presented to the Foster Parents of America Association of the Department of Human Resources, September, 1977

EXHIBIT B

THE STATE OF <u>TEXAS</u>

COUNTY OF _____

I, L. Brooks McKenzie, PhD, Custodian of Records for
    (Custodian of Records Printed Name)

LBH Research & Consulting, located at
(Institution Printed Name)
706 W. 4ᵗʰ St., Clarksville, Texas 75426,
(Institution Printed Address)

do hereby certify that I am of sound mind, capable of making this affidavit,
and personally acquainted with the facts stated herein. Attached hereto are
_____36_____ pages of records from the above listed provider or
facility. The said pages were kept by the above listed provider or
facility in the regular course of business, and it was the regular course of
business for me and any employee or representative of the above listed
provider or facility with knowledge of the act, event, condition, opinion, or
diagnosis recorded to make the record or to transmit information thereof to be
included in such record; and the record was made at or near the time or
reasonably soon thereafter. The record attached hereto is the original or exact
duplicate of the original and no other documents exist on the file for
Dr. David O'Connor _____
  (Account holder's name)

_____
                 (Affiant's Signature)

SWORN TO AND SUBSCRIBED before me on this the __8__ day of
_December_, 20__
_Texas_ _____
(Notary Public, State of Texas)
_Mandy Kelsoe_
(Notary's printed name)
My commission expires:
_3-17-23_ _____

MANDY KELSOE
My Notary ID # 125600401
Expires March 17, 2023

EXHIBIT B

# REVIEW OF FORENSIC CUSTODY EVALUATION

## Assessment for Adherence to Scientific Norms and Empirical Methodology

Brooks McKenzie, PhD

B.McKenzie@LBHResearch.com

EXHIBIT B



## Contents

I.    Introduction ................................................................................................ 2

II.   Validity/Reliability ...................................................................................... 2

III.  Evidence-Based Methods .......................................................................... 6

IV.   Bias ............................................................................................................ 6

V.    Texas Family Code and Texas Rules of Practice for Psychologists ................. 6

VI.   Summary .................................................................................................... 7

VII.  References ................................................................................................. 9



## I.     Introduction

This Author (Brooks McKenzie, PhD) was contacted to review a "Forensic Custody Evaluation" (REPORT) generated by Alyssa Sherry, under the business name of Legal Consensus, dated January 21, 2022. The REPORT and associated documentation (e.g., summaries, scores, etc.) were provided to this Author for review.

On the very last page of this REPORT, Sherry asserts "expertise in personality disorders and attachment". This review of Sherry's REPORT will predominantly focus on the failures in these purported areas of expertise, but will cover other topics as necessary.

These materials were assessed and reviewed by this Author for:

A.     Validity/Reliability

B.     Evidence-Based Methods

C.     Bias

D.     Failures to adhere to the Texas Family Code and Texas Rules of Practice for Psychologists

## II.     Validity/Reliability

In the first paragraph the REPORT states, "the child in this case was too young for formal testing relevant to the legal issue". This is simply not true if Sherry had any intent of assessing the Parent/Child relationship, which would seem to be the underlying issue in question. The Attachment Q-set (AQS; Waters, 1987) is a valid measure of a child's Attachment with a Parent (Cadman, Diamond & Fearon, 2018). The AQS is valid for children aged 1-5 years and is derived from the Strange Situation Procedure (Ainsworth, Blehar, Waters, & Wall, 1978). Attachment is the basis for all Parent/Child relationships. While stating the child "was too young", Sherry failed to utilize this valid measure that is age-appropriate and measures the *exact* construct of interest to any child custody dispute. The *gold standard* measures which are employed to measure Attachment, and the only Valid and widely utilized measures of Attachment, are the Adult Attachment Interview (AAI; Main & Goldwyn, 1985; Main & Hesse, 2002), the Strange Situation Procedure (Ainsworth, Blehar, Waters, & Wall, 1978), and the Attachment Q-set (AQS; Waters, 1987; 1995).

Instead of using applicable psychometric assessments specific to the Parent/Child relationship, Sherry has employed the use of numerous measures that have no association with Parenting, Parent Ability, nor the Parent/Child relationship. The measures listed by Sherry are: Wechsler Abbreviated Scale of Intelligence (WASI), Delis Kaplan Trail Making Test (DKT), Booklet Category Test-2nd Edition (BCT), Minnesota Multiphasic Personality Inventory-2 Restructured Form (MMPI-2 RF), Personality Assessment Inventory (PAI), and the Rorschach Ink Blots-Rorschach Performance Assessment System (RPAS).

EXHIBIT B



The descriptors for each of these measures is taken from the REPORT by Sherry:

*The WASI provides an estimate of one's cognitive or intellectual ability and some insight into cognitive strengths and weaknesses.*

*This DKT is a screening measure for executive functioning impairments in cognitive flexibility.*

*The BCT measures cognitive flexibility, difficulty in altering problem-solving strategies in response to verbal feedback, difficulty in awareness, planning, and self-regulation.*

*The MMPI-2 RF is an objective, self-report personality test that aids clinicians in the assessment of mental disorders, identification of specific problem areas, and treatment planning.*

*The PAI is a self-report personality test that provides information about clinical diagnoses, indicators of potential complications in treatment, and an assessment of each individual's interpersonal style.*

*The RPAS, the Rorschach Ink Blot Test is a perceptual test that measures one's approach to a novel situation. Responses are compared to those from a normative data set of people presenting with various psychological states and traits. The test assesses a variety of approaches to the world including level of engagement and cognitive processing of environmental stimuli, perception, and thinking problems including problems with reality testing, levels of current stress or distress, relationships of self and other including the ability to build and maintain healthy, mature relationships through attachment and connection, and the quality of one's engagement in the broader world.*

None of these measures has any association whatsoever with Parenting, Parent Ability, nor the Parent/Child relationship. The WASI and DKT are measures of cognitive ability, the RPAS is not accepted by the scientific community for evidence-based assessment (Tex Fam Code 107.108(c)), and the MMPI-2-RF and PAI are measures of psychopathology.

EXHIBIT B

**L B H** Research & Consulting

A.      The "Test Score Reference Sheet" provided from the REPORT contains the WASI, MMPI-II-RF, PAI, DKT, BCT, and RPAS results, but both of the Reference Sheets have the name of David O'Connor on them. While the file name of these sheets are different (one for O'Connor one for Ho), there seems to be a serious problem with the administration, Reliability, and Validity of these results (22 Tex. Admin. Code § 465.16).

B.      RPAS –is known to be inappropriate per Frye and Daubert guidelines (Gurley, Sheeham, Piechowski, & Gray, 2014; Kivisto, Gacono, & Medoff, 2013) and has no value in Child Custody contexts.

C.      WASI, DKT, BCT – have no association with parenting whatsoever, unless a participant has extremely low scores and would present a danger to the child due to severe cognitive deficits.

D.      MMPI-II-RF – has no association with parenting whatsoever, unless a participant displays extreme scores and would present a danger to the child due to severe psychopathology indicators.

1.      Of great concern with regard to the REPORT and the use of the MMPI-II-RF is that nowhere in the REPORT are the scores reported for either Parent.

2.      Sherry in numerous places reports severe indicators of psychopathology for O'Connor throughout the REPORT, yet when the actual scoring sheets from the MMPI-IIRF were assessed, there are no indications of any concern for the psychopathology or personality disorder that Sherry repeatedly attributed to O'Connor throughout the REPORT.

3.      Conversely, Sherry reports has no areas of concern for Ho, and even supplies overtly bias opinioos, stating Ho is a "good mother"; bias is overt as no measure has been utilized that would indicate anything to do with being a good mother. Yet, the MMPI-II-RF scores for Ho indicate numerous and extremely concerning indicators of psychopathology. These indicators have been designated by the authors of the MMPI and  MMPI-II as "critical item content that may require immediate attention" (Arbisi & Ben-Porath, 1995; Butcher et al., 1989; Hathaway & McKinley, 1951). The 2 major areas of concern displayed by Ho:

a)      Anxiety

b)      Ideas of Persecution



E.      PAI - has no association with parenting whatsoever, unless a participant displays extreme scores and would present a danger to the child due to severe psychopathology indicators.

    1.      Of great concern with regard to the REPORT and the use of the PAI is that nowhere in the REPORT are the scores reported for either Parent.

    2.      As with the MMPI-II-RF, Sherry in numerous places reports severe indicators of psychopathology for O'Connor throughout the REPORT. As before, when PAI scores were assessed there are no indications of any concern for the psychopathology or personality disorder that Sherry repeatedly attributed to O'Connor throughout the REPORT.

    3.      As with the MMPI-II-RF, the PAI scores for Ho indicate numerous and extremely concerning indicators of psychopathology, as denoted by the PAI summary. The multiple major areas of concern displayed by Ho:

        a)      Delusions and Hallucinations

        b)      Potential for Aggression

        c)      Substance Abuse

        d)      Statistically significant associations with numerous groups who have known behavioral and/or psychological disorders.

F.      Of great concern is that if one were to take the REPORT produced by Sherry at face-value, O'Connor is presented as having severe personality and psychopathological issues, while Ho is painted as a victim to O'Connor's abuse and psychopathology. Yet, when results from the 2 psychometric assessments (MMPI-II-RF and PAI) that are Reliable and Valid for measuring psychopathology and personality disorders were reviewed, the exact opposite of what Sherry reported is found.

G.      There is no possible way to misinterpret the extremely clear results from these 2 assessments (MMPI-II-RF and PAI); these measures supply the administrator with computerized summaries that clearly state the results. There is no possible way to arrive at the conclusions reported in this REPORT by Sherry without utterly ignoring the empirical results of the 2 assessments and simply making up a narrative that exactly contradicts the evidence from these measures.

H.      This REPORT by Sherry has no Validity whatsoever as it has utterly ignored the empirical results of the objective measures administered. The entire REPORT is unsupported opinions, contradicted by the empirical evidence. This is at best severe incompetence, and is likely unethical, ideologically driven bias directed at O'Connor; this level of incompetence is unlikely barring severe mental health issues or neurological deficit.

### III.   Evidence-Based Methods

A.      As noted previously, the only Evidence-Based portion of the REPORT produced by Sherry are the cognitive assessments (WASI, DKT, BCT) and psychopathology assessments (MMPI-II-RF and PAI). The cognitive assessments do not supply any information of note as they are mislabeled and cannot be attributed to either O'Connor or Ho. The psychopathology assessments were completely disregarded by Sherry and were actually contradicted by her entire narrative in this REPORT. The combination of these two extremely concerning events results in absolutely no application of an Evidence-Based Method in the entire REPORT.

B.      There is absolutely no empirically driven method that would ever begin to justify what was written and submitted by Sherry in this REPORT. Sherry's narrative contradicts ever piece of empirical/objective data.

### IV.   Bias

A.      As noted, there is no valid use of measures in this REPORT; all measures were either mislabeled or their valid results were completely ignored. Sherry did not assess the Parent/Child relationship between O'Connor and the child. Sherry did not administer any assessment of Parenting ability for either Parent. Sherry failed to report the very concerning results of Ho's MMPI-II-RF and PAI, both of which indicate severe psychopathology. Sherry made claims of severe psychopathology regarding O'Connor, when none was shown in either the MMPI-II-RF or PAI.

B.      Taken together, the above can only be explained by bias; outside of other unlikely possibilities. When ALL of the empirical evidence gathered for this REPORT completely contradicts what is reported, and the author (Sherry) claims to be an expert in the field, the most likely explanation is bias. The only other unlikely possibilities are as follows:

1.      Sherry is not an expert
2.      Severe mental health issue that affected competence
3.      Neurological deficit that affected competence

### V.   Texas Family Code and Texas Rules of Practice for Psychologists

A.      Alyssa Sherry states on the last page of her REPORT that she "has read and meets the requirements of Section 107.104 and was appointed under Section 107.106 of the Texas Family Code."

B.      There are numerous violations of the Texas Family Code 107 throughout this entire REPORT. Some of the more notable are as follows:

C.      Tex Fam Code 107.108(c) A child custody evaluator shall follow evidence-based practice methods and make use of current best evidence in making assessments…;



     1.     Nowhere is the entire REPORT is any mention of any *evidence-based* assessment of the Parent/Child relationship, even though such measures have existed since the 1980s.

     2.     All Evidence-Based Methodologies and Measures were ignored and actually contradicted by Sherry in her unfounded diatribe against O'Connor.

D.     Tex Fam Code 107.109(c)(7) assessment of the relationship between each child who is the subject of the suit and each party seeking possession of or access to the child;

     1.     Nowhere is the entire REPORT is any mention of any actual assessment of the Parent/Child relationship at all.

     2.     There does not even appear to be an informal or subjective evaluation of the Parent/Child relationship.

DI.     22 Tex. Admin. Code § 465.16

     1.     Numerous and overt violations of TAC 465.16 are present throughout this entire REPORT produce by Alyssa Sherry.

     2.     These violations can be found under each of the subheadings listed: Scope and Purpose, Reliability and Validity, Limitations, Test Security and Validity, and Production of Reports. It is confidently asserted that these violations affect and are found in all stages of production of this REPORT.

## VI.   Summary

This REPORT produced by Alyssa Sherry does not appear to meet the requirements of the (a) Texas Family Code, (b) Texas Rules of Practicing Psychologists, or (c) any guidelines of best practice or empirically based methodology. The stunning and overt disregard for anything resembling objectivity or evidence based conclusions is extremely disturbing, unprofessional, and unethical, barring any outside factors affecting competence (i.e., mental or neurological health issues).

There is absolutely no intrinsic value in this REPORT as to its stated purpose (first paragraph, first page):

> *This is a report in response to a Court Order for a custody evaluation for the above referenced case. The Order requested complete psychological evaluations of both parties, including cognitive screening, personality testing, and projective testing. The evaluator was ordered to identify any relevant mental health disorders as a part of these evaluations. A complete assessment of the child commensurate with the child's age. The child in this case was too young for formal testing relevant to the legal issue and thus assessment was limited to*



> *observations between each parent and the child in their respective homes and two interviews with the child as well as a review of the child's medical records and interviews of the adults involved in the child's development and care. The order requested a complete assessment of the family system, including, but not limited to evaluating the existence or absence of parental alienation, any risk or protective factors present for the child's development, the extent of the parent/child fit, and any unique mental health needs and the contribution of the family system to these mental health needs.*

Instead, what was produced is an absolutely indefensible report that ignored every single objective measure, every opportunity for evidence-based assessment, and borders on outright maliciousness and overt misrepresentation of all available objective data. Ironically, Sherry reports in the Methodology/Procedures section of the REPORT to be searching for "convergent validity", but completely ignores the convergent validity that was glaringly obvious via the MMPI-II-RF and PAI test results for Ho.

It is the belief of this author that Alyssa Sherry intentionally and maliciously fabricated the findings and conclusions contained in this REPORT. Whether for some personal benefit and/or bias towards O'Connor, there is absolutely no possible way to arrive at the conclusions presented in this REPORT, unless factors affecting the mental competence of Sherry are present.

This report completed by:

Brooks McKenzie, PhD
President
LBH Research & Consulting
972.837.5678
B.McKenzie@LBHResearch.com





## VII.   References

Ainsworth, M. D. S., Blehar, M. C., Waters, E., & Wall, S. (1978). *Patterns of Attachment: A psychological study of the Strange Situation*. Hillsdale, NJ: Erlbaum.

Arbisi, P. A., & Ben-Porath, Y. S. (1995). An MMPI-2 infrequent response scale for use with psychopathological populations: The Infrequency-Psychopathology Scale, F (p). Psychological assessment, 7(4), 424.

Butcher, J. N., Dahlstrom, W. G., Graham, J. R., Tellegen, A., & Kaemmer, B. (1989). Manual for the administration and scoring of the MMPI-2.

Hathaway, S. R., & McKinley, J. C. (1951). Minnesota multiphasic personality inventory; manual, revised.Cadman, T, Diamond, PR, Fearon, P. (2018) Reassessing the validity of the attachment Q-sort: An updated meta-analysis. *Infant and Child Development 27*(1).

Gurley, J. R.; Sheeham, B. L.; Piechowski, L.D.; Gray, J. (2014). The admissibility of the R-PAS in court. *Psychological Injury and Law* (7), 9–17.

Kivisto, A. J.; Gacono, C. B.; Medoff, D. (2013). Does the R-PAS meet standards for forensic use? Considerations with introducing a new Rorschach coding system. *Journal of Forensic Psychology Practice* (13), 389–410.

Main, M., & Goldwyn, R. (1985). *Adult Attachment scoring and classification system*. Unpublished manuscript, Department of Psychology, University of California, Berkeley.

Main, M., Goldwyn, R., & Hesse, E. (2002). *Adult Attachment scoring and classification systems*. Unpublished manuscript, Department of Psychology, University of California, Berkeley.

PAI Inc. (2022). PAI Personality Assessment Inventory. Retrieved May 31, 2022 from https://www.parinc.com/Products/Pkey/287

State of Texas (2022). 22 Texas Administrative Code § 465.16. Retrieved May 31, 2022 from https://texreg.sos.state.tx.us

State of Texas (2022). Texas Family Code. Retrieved May 31, 2022 from https://statutes.capitol.texas.gov/

Waters, E. (1987). Attachment Q-set (Version 3). Retrieved May 1, 2013 from http://www.johnbowlby.com

EXHIBIT B



Waters, E. (1995). The Attachment Q-set (Version 3.0). *Monographs of The Society for Research in Child Development*, *60*(2-3), 234-246. doi: 10.1111/j.1540-5834.1995.tb00214.x

EXHIBIT B

2022

# Attachment Assessment O'Connor

CONFIDENTIAL REPORT

DR. BROOKS MCKENZIE

LBH RESEARCH & CONSULTING, LLC | Clarksville, Texas

**CONFIDENTIAL USE ONLY**

*RE:* O'Connor

# Contents

Summary ............................................................................................ 2

A)   Purpose of Evaluation ................................................................. 2

B)   Attachment Overview ................................................................. 2

a.   Intergenerational Transmission of Attachment ............................. 6

b.   Effects of Disrupted Attachment/Parent-Child Relationships ........... 6

c.   Effects of Fatherlessness on Children .......................................... 7

C)   Methods and Results.................................................................. 7

D)   Summary .................................................................................. 10

E)   References ............................................................................... 11

F)   Qualifications of Evaluator........................................................... 17

Appendix A: Formal AAI Scores Dr. O'Connor 01/29/2022 .......................... 18

Appendix B: Adult Attachment Interview Certification .............................. 20

Appendix C: Curriculum Vitae – Dr. L. Brooks McKenzie ........................... 21

Copyright © | Dr. Brooks McKenzie | LBH Research & Consulting, LLC

Do not reproduce in any form without written permission.

**CONFIDENTIAL USE ONLY**

*RE:* O'Connor

# Summary

The intent of this report is to convey the findings of Dr. Brooks McKenzie, with regard to the Attachment pattern of Dr. David O'Connor and his son L.O.

## A) Purpose of Evaluation

Dr. McKenzie was engaged for the purpose of assessing the Attachment pattern of Dr. O'Connor via administration of the Adult Attachment Interview, and the Attachment relationship between L.O. and Dr. O'Connor.

## B) Attachment Overview

Attachment theory (Bowlby, 1969/1982, 1973, 1980) is possibly the most recognized and well-studied concept in Developmental Psychology. This theory posits that instinctual and adaptive programming allows for the formation of bonds between infant and caregiver. This bond is a product of the infant's mental representation of the caregiver. The infant forms this representation via experiential learning through repeated interactions with the caregiver. When a caregiver provides a safe, stable and nurturing environment, the infant is able to form a healthy mental representation of the caregiver. A safe and responsive environment created by the caregiver is believed to be crucial to the development of a Secure Attachment (Bowlby; Simpson, 1999).When an infant experiences neglect, inconsistent care, abuse, or frightening behavior from the caregiver, the mental representation developed by the infant will reflect these experiences. It is by these negative representations that Insecure Attachments are formed.

There are four classifications of infant/child Attachment: Secure, anxious-avoidant, anxious-ambivalent, and disorganized; these are categorized in two separate ways: (a) Secure vs. Insecure and (b) organized vs. disorganized (see Benoit, 2004 for discussion). Secure Attachment is both Secure and organized. Of the three Insecure classifications, only anxious-avoidant and anxious-ambivalent are organized. Secure infants and children are believed to have received responsive and nurturing care that has led to the development of working-models of the Attachment figure and self that reflect the safety and consistency of that relationship. These working-models are enable the child to better process their environment, self-regulate affect and behavior, and engage in deep meaningful relationships, thereby reducing psychological and physical stress throughout the lifespan. Anxious-avoidant children often have not received responsive care nor had their needs met in a nurturing manner (i.e., rejecting), learning that bids for affection and nurture are not fulfilled by the caregiver. Anxious-ambivalent children are believed to have received inconsistent care with regard to their needs or bids for affection. Disorganized children are believed to have been exposed to frightening, frightened, and/or

Copyright © | Dr. Brooks McKenzie | LBH Research & Consulting, LLC

Do not reproduce in any form without written permission.

CONFIDENTIAL USE ONLY

*RE:* O'Connor

incompetent caregiving, in such a manner that the child has been unable to develop an organized response to their environment. These children are believed to have caregivers who are not only their supposed source of safety, but also their source of fear. This creates an inability to organize a coherent strategy to process the caregiver-child relationship which in turn affects the child's ability to process their environment. While increased risk for cognitive, social, and behavioral difficulties, and poorer mental and physical health outcomes have been found for insecurely attached children, children exposed to frightening, frightened, and/or incompetent caregiving have a greater probability of developing a disorganized Attachment (van IJzendoorn, Schuengel, & Bakermans-Kranenburg, 1999), which is associated with even greater behavioral problems, psychopathology, cognitive difficulties, and stress dysregulation than those evidenced in other types of non-Secure ttachments (e.g., Bohlin, Eninger, Brocki, & Thorell, 2012; van Ijzendoorn et al., 1999).

Research has identified links between abuse/neglect, Insecure and/or disorganized Attachment, and a myriad of health, social, psychological, and physiological difficulties that may endure across the lifespan (e.g., Bohlin et al., 2012; Burgess, Marshall, Rubin, & Fox, 2003), while Secure Attachment has been found to be a buffer against many environmental and social stressors (e.g., Sroufe, Egeland, & Kruetzer, 1990). Therefore, infants and children who are exposed to sub-optimal care with regard to having their emotional needs met in a safe and nurturing manner are at greater risk across their lifespan for behavioral problems, drug/alcohol abuse, poor relationships, physiological/medical difficulties, and even premature death. Additionally, Attachment patterns developed in childhood have been found to endure across the lifespan (Fraley, 2002), which may account for the poor outcomes for children and adults with Insecure/disorganized Attachment patterns. It is believed that the continual stress upon the hypothalamic-pituitary-adrenal (HPA) axis associated with an Insecure/disorganized Attachment pattern creates an ongoing 'threat' that prohibits healthy development across numerous domains, both psychological and physiological. Research has delineated the infant Attachment cycle at a physiological/neurochemical level (Schore, 2001). As shown in Figures 1 and 2, an optimal Need Expressed/Need Met cycle promotes Secure Attachment, and behavioral, biological, and neurochemical balance in the infant's stress-response system, which is centered in the HPA axis (Schore, 2001), while The Attachment cycle likewise helps an infant achieve neurochemical balance between the expression of excitatory and inhibitory neurotransmitters (see Schore, 2001 for discussion). The Need Expressed phase prompts the release of excitatory neurotransmitters associated with the *fight, flight, or freeze* survival mechanisms (e.g., dopamine, adrenaline), while the Need Met phase prompts the release of

Copyright © | Dr. Brooks McKenzie | LBH Research & Consulting, LLC

Do not reproduce in any form without written permission.

CONFIDENTIAL USE ONLY

*RE:* O'Connor



*Figure 1.* The attachment cycle illustrates the interplay between an infant and caregiver's behavior, and the neuropsychological feedback experienced by the infant when their needs are met.



*Figure 2.* Disruptions of the attachment cycle place the developing infant at risk for a variety of neuropsychological imbalances.

inhibitory neurotransmitters associated with safety, comfort, and contentment (e.g., serotonin, GABA). This neurochemical balance becomes the foundation for mental health, well-being, and stability (Kraemer, 1992; Schore, 1994; Suomi, 1999); without balance, a chronic state of fear/anxiety may override the proper functioning of numerous developmental and cognitive systems.

The interplay between caregiver responsiveness, the neurochemical response of the infant, and the critical periods of Attachment formation have been well documented (see Zeanah, Berlin, & Boris, 2011 for discussion). As shown in Table 1, critical periods of an infant's early years drive the formation of Attachment, whether Secure or Insecure. The age ranges presented in Table 1 represent the cognitive age of the child, rather than the chronological age. Delays in these benchmarks can be caused by abuse, neglect, privations, and physiological insult, among other things. Interestingly, aberrant environmental conditions (i.e., poor quality and/or unloving caregiving) impair development of Attachment more than physical or neurological abnormalities (Zeanah, et al., 2011).

These critical stages of infant Attachment development have been found to be most important from about 6 months of age to 24 months of age. Children adopted from harsh conditions prior to 6 months of age later show little sign of the abuse/neglect, and deprivation(s) that they may have endured (Rutter, Kunsta, Schlotz, & Sonuga-Barke, 2012), while children adopted before 12 months typically show no differences in Attachment when compared to their low-risk peers (van den Dries, Juffer, van IJzendoorn, & Bakermans-Kranenburg, 2009). Children adopted past the age of 12 months typically show the greatest difficulties in multiple domains

Copyright © | Dr. Brooks McKenzie | LBH Research & Consulting, LLC

Do not reproduce in any form without written permission.

CONFIDENTIAL USE ONLY

*RE:* O'Connor

(physiological, Attachment, behavioral, etc.), and many may not fully recover from early deprivation, trauma, or poor caregiving.

**Table 1.** Critical Developmental Periods in infancy and early childhood.

## Attachment Benchmarks

| | |
|---|---|
| First 2 months | Infant has limited ability to discriminate among different caregivers; recognize mothers' smell and sound but no preference expressed. |
| 2-3 months | Emergence of social interaction, with increased eye to eye contact, social smiling and responsive cooing. |
| 2-7 months | Able to discriminate among different caregivers but no strong preferences expressed; comfortable with many familiar and unfamiliar adults and intensely motivated to engage them. |
| 7-9 months | Emergence of selective Attachment as evidenced by onset of stranger wariness (initial reticence) and separation protest (distress in anticipation of separation from Attachment figures). |
| 9-18 months | Hierarchy of Attachment figures evident. Infant balances the need to explore and the need to seek proximity; these become even more evident with independent ambulation emerging at approximately 12 months. Secure base behaviors (moving away from the caregiver to explore) and safe haven behaviors (returning to the caregiver for comfort and support) both evident. |
| 18-20 months | Emergence of symbolic representation, including pretend play and language. |
| 20-36 months | Goal-corrected partnership in which the child becomes increasingly aware of conflicting goals with others and for the need to negotiate, compromise and delay gratification. |
| 36+ months | Secure base and safe haven behaviors continue but behavioral manifestations become less evident because of the child's increased verbal skills. Internal representations of Attachment more accessible to observers through narrative doll play. |

*Note.* Age ranges are tied to *cognitive* rather than chronological ages. Table adapted from (Zeanah, et al., 2011).

Copyright © | Dr. Brooks McKenzie | LBH Research & Consulting, LLC

Do not reproduce in any form without written permission.

### a. Intergenerational Transmission of Attachment

The immense impact that early experiences have upon a child cannot be overstated, yet it is simply not these experiences, but rather the Attachment relationship(s) with the Primary caregiver(s) that have the most enduring effects (see Cassidy & Shaver, 2016). These relationships begin at birth, the Attachment relationships start to come online at approximately 6 months of age, and are shaped throughout childhood and adolescence into early adulthood.

Numerous meta-analyses across decades of research have consistently found that a caregiver's Attachment pattern is highly correlated with the child's Attachment pattern, and dictates the health (or lack thereof) of that child-caregiver relationship (e.g., van IJzendoorn, 1995; Verhage et al, 2105). These repeated findings across a multitude of studies conducted "all over the globe" have also determined that neither a behavioral nor molecular genetic explanation of cross-generational continuity of Attachment accounts for this transmission of Attachment from caregiver to child. According to the authors of one such recent mata-analysis, "the association between caregiver attachment representations and child-caregiver attachment has been confirmed as a robust and universal effect by this new series of meta-analyses" (Verhage, p. 23). The Attachment patterns of a child, and the beneficial or detrimental effects of that Attachment pattern, have repeatedly been related to the Attachment experiences and relationships that a child has with their Primary caregiver(s).

### b. Effects of Disrupted Attachment/Parent-Child Relationships

Disruption of Attachment, the severing or damaging of an Attachment relationship, is a severe and well-documented trauma that effects a child over the course of a life-span across multiple domains (e.g., Lawrence, Carlson, & Egeland, 2006, Rutter & O'Connor, 2004, USDHHS, 2009) and represent significant risk for the development of psychopathology (ex. Adam & Chase-Lansdale, 2002; Carlson, Egeland, & Sroufe, 2009; Cassidy & Shaver, 2016). The exponential risk for children to exhibit significant problems in all domains of development (e.g., learning, socioemotional, cognitive, physiological, etc.) has been well documented for decades, as have the effects that continue into adulthood (Schneider, et al. 2009). Children who are denied consistent and continual caregiving from their parents have suffered a serious trauma, have significantly worse outcomes in all areas of development, and they are at a much greater risk of transmitting this trauma to their own children (e.g., Özcan, 2016). By definition, divorce and/or custody disputes cause a Disruption of Attachment, and custody arrangements that do not place the child's need for *consistent and continual access to both parents at*

Copyright © | Dr. Brooks McKenzie | LBH Research & Consulting, LLC

Do not reproduce in any form without written permission.

*all times* is a well-established trauma to the child that will have severe and life-long negative effects.

### c. Effects of Fatherlessness on Children

Over and above the extreme trauma a child experiences during a divorce/custody dispute and the subsequent disruption of Attachment, the effects of restricting a child's access to the father have proven to be even more traumatic for children (e.g., U.S. Census Bureau, 2011). Society has long recognized the deleterious effects of Fatherlessness and governments have continually attempted to address this epidemic of trauma to children, yet those making such decisions regarding custody have been ignorant of or simply ignored more than 6 decades of empirical research on child development.

*Some of the negative effects* for these children who are raised in fatherless homes are: 4X more likely to live in poverty (USCB, 2011) 10X more likely to abuse alcohol/drugs (Hoffman 2002, USDHHS, 1993), more likely to have severe internalizing and/or externalizing behaviors (Hofferth, S. L., 2006), more likely to experience psychiatric hospitalizations (Block, Block & Gjerde, 1988), and are at much greater risk for suicide, criminal activity, and a myriad of other difficulties. Again, these risks and effects last a life-time and are well-established by decades of peer-reviewed scientific research (e.g., Amato 2001; Amato & Keith 1991; Bramlett and Blumberg, 2007; Clarke-Stewart & Hayward, 1996).

### C) Methods and Results

#### Adult Attachment Interview (AAI)

While there is some evidence of empirical Attachment assessments being utilized in child custody hearings, and arguments that they easily meet Daubert Standards (Purvis, McKenzie, Kellermann, & Cross, 2010), it has been found that most measures and techniques currently employed by evaluators to measure the child-caregiver relationship have no scientific or theoretical bases, lack established reliability and validity, and often have little to do with Attachment theory (Byrne, O'connor, Marvin, & Whelan, 2005). This is not due to a lack of empirically validated measures that are widely utilized and accepted as 'gold standards' by which to measure adult and infant Attachment, but rather is noted as a "a clear misunderstanding and misapplication of Attachment theory" (Byrne, et al., 2005, p 117). The *gold standard* measures which are employed to measure Attachment, and the only widely accepted measures of Attachment, are the Adult Attachment Interview (AAI; Main & Goldwyn, 1985; Main & Hesse, 2002), the Strange Situation Procedure (Ainsworth, Blehar, Waters, & Wall, 1978), and the Attachment Q-set (AQS; Waters, 1987).

Copyright © | Dr. Brooks McKenzie | LBH Research & Consulting, LLC

Do not reproduce in any form without written permission.

**CONFIDENTIAL USE ONLY**

*RE:* O'Connor

The AAI was utilized to measure the Adult Attachment Pattern of Dr. O'Connor on January 29, 2022.

The AAI has been utilized in a multitude of domains throughout Developmental Psychology and numerous other scientific fields of research (see Cassidy & Shaver, 2016), and is regarded as the *gold standard* in Adult Attachment measurement (see Siegel, 1999) with well-established validity and reliability across various contexts (e.g., Bakermans-Kranenburg & van IJzendoorn, 1993;  Bakermans-Kranenburg & van IJzendoorn, 2009; Beijersbergen, et al., 2012), with children as young as 14 years of age, and non-normal populations (ex. Beijersbergen et al., 2012; Buchheim et al. 2006; Buchheim et al. 2008).

The AAI was administered to Dr. O'Connor on January 29, 2022. The interview lasted approximately 1 hour, was audio recorded, and performed in line with established/manualized protocols. Prior to the administration of the AAI, Dr. O'Connor stated he was free from distraction, feeling physically and emotionally healthy, and ready to participate.

The AAI results for Dr. O'Connor indicate a Secure pattern of Attachment (F-General); a Secure classification (see Appendix A for formal scores).

The AAI results for Dr. O'Connor find a Secure pattern of Attachment; the optimal Attachment classification for a caregiver (see Appendix A for formal scores). This indicates that Dr. O'Connor is able to meet the emotional and psychological needs of his child, and that an active healthy relationship (i.e., consistent parenting) will provide the child with buffers against current and future life/environmental stressors, minimizing deficits that are associated with the effects of Divorce, Attachment Disruption, and other adverse events that L.O. has experienced.

### Attachment Q-set (AQS)

The AQS has been repeatedly found to be a valid and reliable measure of Secure versus Insecure Attachment relationships between child and parent (Cadman, Diamond, & Fearon, 2018). The AQS observation was performed on two (2) separate occasions. The initial AQS was performed utilizing recorded interactions between Dr. O'Connor and his son. This recording was dated December 8, 2019 and was approximately 1 hour and 14 minutes in length. The second AQS was performed in a public park on February 20, 2022, and the observation lasted approximately 1 hour 45 minutes. Each AQS was formally scored and calculated the same day as observation. The AQS was scored according to the Q-sort method outlined by Waters (1995), and the Security and Dependency Criterion of Pederson and Moran (1995) was applied.

The AQS items were then correlated (Table 2), and items indicative of Security of Attachment to each parent were highly correlated with placement in the Q-sort.

Copyright © | Dr. Brooks McKenzie | LBH Research & Consulting, LLC

Do not reproduce in any form without written permission.

CONFIDENTIAL USE ONLY

*RE:* O'Connor

Additionally, items that are indicative of an Insecure Attachment were negatively correlated with Q-sort placement.

**Table 2.** Pearson Correlation Matrix of O'Connor AQS Scores

|  | FATHER t1 | FATHER t2 | SECURITY | DEPENDENCY |
|---|---|---|---|---|
| FATHER t1 | 1.000 |  |  |  |
| FATHER t2 | 0.728* | 1.000 |  |  |
| SECURITY | 0.832* | 0.870* | 1.000 |  |
| DEPENDENCY | 0.119 | -0.029 | -0.020 | 1.000 |

*Note.* Scores on the AQS range from -1.0 to +1.0, * denotes Significant Correlation. *t1* = Time 1, *t2* = Time 2.

These findings indicate that L.O. displays a very strong, healthy Secure Attachment to Dr. O'Connor, on two (2) separate occasions.

Scores of 0.832 and 0.870 for Security are well above reported means in normal populations, while the very low negative correlations for Dependency indicates an absence of Insecure tendencies, as delineated by the Pederson and Moran criterion.

Additionally, the application of the AQS across differing milieux and points in time provides very strong for the findings of a healthy Secure Attachment between L.O. and Dr. O'Connor.

**Document Review**

An attempt was made to assess a "Forensic Custody Evaluation" authored by Alyssa Sherry, generated on January 21, 2022. The intent of reviewing this document was to determine if this document contained any convergent or contradictory evidence. Unfortunately, this document in no way met any standards of testing or data analyses that could ever meet best-practices or empirical rigor, therefore providing no information about the relationship between Dr. O'Connor and L.O. Conversely, after reviewing this document, a separate report was generated outlining the gross misrepresentation of what the actual data collected indicated and what the author of that document presented.

As this report (Attachment Assessment O'Connor, authored by Dr. Brooks Mckenzie) is intended to assess the relationship between L.O. and Dr. O'Connor and parenting ability of Dr. O'Connor, no information from the document generated by Alyssa Sherry was of any value. Nothing contained in the Sherry document had any

Copyright © | Dr. Brooks McKenzie | LBH Research & Consulting, LLC

Do not reproduce in any form without written permission.

CONFIDENTIAL USE ONLY

**RE:** O'Connor

association with the Parent/Child relationship or parenting ability, and is of no value.

## D) Summary
### Interpretations of Data

The Secure AAI pattern of Dr. O'Connor and the Secure Attachment displayed by L.O. during the AQS indicates that L.O. is thriving while being parented by Dr. O'Connor. These findings, in line with decades of research that delineate the effects of Attachment on children's outcomes, indicate that L.O. benefits greatly from close, consistent contact with his father. Inversely, it is well established that Disrupting any Attachment relationship greatly harms a child, but tampering with a Secure Attachment relationship has compounded effects that certainly would last a lifetime, and would easily meet the definition of Child Abuse as defined by the Texas Family Code 261.00.

This strong and healthy Attachment to Dr. O'Connor indicates that it would be extremely detrimental and harmful to L.O.  if he were removed from the care of the Dr. O'Connor. Such a removal would cause severe damage to L.O. emotionally, psychologically, and across all domains (e.g., cognitive, social, physiological, etc.); effects that have been found to endure across the lifespan. Simply put, this is not an opinion, it is the prediction of over 4 decades of expensive empirical research in Child Development.

**This report was completed in its entirety by:**



Brooks McKenzie, PhD
President
LBH Research & Consulting
972.837.5678
B.McKenzie@LBHResearch.com

LBH Research & Consulting LLC

May 30, 2022

Copyright © | Dr. Brooks McKenzie | LBH Research & Consulting, LLC

Do not reproduce in any form without written permission.

## E) References

Adam, E. K., & Chase-Lansdale, P. L. (2002). Home sweet home(s): parental separations, residential moves, and adjustment problems in low-income adolescent girls. Developmental psychology, 38(5), 792–805.

Ainsworth, M. D. S., Blehar, M. C., Waters, E., & Wall, S. (1978). *Patterns of Attachment: A psychological study of the Strange Situation*. Hillsdale, NJ: Erlbaum.

Amato, P. (2001) Children of divorce in the 1990s: An update of the Amato and Keith (1991) meta-analysis. *Journal of Family Psychology, Vol 15*(3), pp 355-370.

Amato, P. & Keith, B. (1991) Parental Divorce and Adult Well-Being: A Meta-Analysis. *Journal of Marriage and Family, 53*(1), 43-58.

American Psychiatric Association. (2000). Diagnostic and statistical manual of mental disorders (4th ed., text rev.). doi:10.1176/appi.books.9780890423349.

Bakermans-Kranenburg, M.J., & van IJzendoorn, M.H. (1993). A psychometric study of the Adult Attachment Interview: Reliability and discriminant validity. *Developmental Psychology*, 29, 870–880

Bakermans-Kranenburg, M. J., & van IJzendoorn, M. H. (2009). The first 10,000 Adult Attachment Interviews: distributions of adult attachment representations in clinical and non-clinical groups. *Attachment & human development*, 11(3), 223–263. https://doi.org/10.1080/14616730902814762

Beijersbergen, M. D., Juffer, F., Bakermans-Kranenburg, M. J., & van IJzendoorn, M. H. (2012). Remaining or becoming secure: parental sensitive support predicts Attachment continuity from infancy to adolescence in a longitudinal adoption study. *Developmental psychology*, 48(5), 1277–1282. https://doi.org/10.1037/a0027442

Benoit, D. (2004). Infant-parent Attachment: Definition, types, antecedents, measurement and outcome. *Paediatrics & Child Health, 9*(8), 541-545.

Block, J., Block, J. H., & Gjerde, P. F. (1988). Parental functioning and the home environment in families of divorce: Prospective and concurrent analyses. *Journal of the American Academy of Child & Adolescent Psychiatry, 27*(2), 207-213.

Bohlin, G., Eninger, L., Brocki, K., & Thorell, L. B. (2012). Disorganized Attachment and inhibitory capacity: Predicting externalizing problem behaviors. *Journal

Copyright © | Dr. Brooks McKenzie | LBH Research & Consulting, LLC

Do not reproduce in any form without written permission.

*of Abnormal Child Psychology*, *40*(3), 449-458. doi:10.1007/s10802-011-9574-7

Bowlby, J. (1969/1982). *Attachment and loss: Vol. 1: Attachment*. New York: Basic Books.

Bowlby, J. (1973). *Attachment and loss: Vol. 2: Separation*. New York: Basic Books.

Bowlby, J. (1980). Attachment and loss, Vol. III, Loss: Sadness and depression. New York: Basic Books.

Bramlett, M. D., and Blumberg, S. J. (2007). Family structure and children's physical and mental health. *Health Affairs, 26*, 549–558.

Buchheim, A., Erk, S., George, C., Kächele, H., Kircher, T., Martius, P., Pokorny, D., Ruchsow, M., Spitzer, M., & Walter, H. (2008). Neural correlates of Attachment trauma in borderline personality disorder: a functional magnetic resonance imaging study. *Psychiatry research*, *163*(3), 223–235. https://doi.org/10.1016/j.pscychresns.2007.07.001

Buchheim, A., Erk, S., George, C., Kachele, H., Ruchsow, M., Spitzer, M., Kircher, T., & Walter, H. (2006). Measuring Attachment representation in an FMRI environment: a pilot study. *Psychopathology*, *39*(3), 144–152. https://doi.org/10.1159/000091800

Burgess, K. B., Marshall, P. J., Rubin, K. H., & Fox, N. A. (2003). Infant Attachment and temperament as predictors of subsequent externalizing problems and cardiac physiology. *Journal of Child Psychology and Psychiatry, 44*(6), 819-831. doi:10.1111/1469-7610.00167

Byrne, J. G., O'Connor, T. G., Marvin, R. S., & Whelan, W. F. (2005). Practitioner Review: The contribution of Attachment theory to child custody assessments. *Journal of Child Psychology and Psychiatry*, *46*(2), 115-127. doi:10.1111/j.1469-7610.2004.00396.x

Cadman, T., Diamond, P. R., & Fearon, P. (2018) Reassessing the validity of the attachment Q-sort: An updated meta-analysis. *Infant and Child Development 27*(1).

Carlson, E. A., Egeland, B., & Sroufe, L. A. (2009). A prospective investigation of the development of borderline personality symptoms. *Development and psychopathology*, *21*(4), 1311–1334. https://doi.org/10.1017/S0954579409990174

Cassidy, J., & In Shaver, P. R. (2016). *Handbook of Attachment: Theory, research, and clinical applications.*

Copyright © | Dr. Brooks McKenzie | LBH Research & Consulting, LLC
Do not reproduce in any form without written permission.

**CONFIDENTIAL USE ONLY**

*RE:* O'Connor

Chaffin, M., Hanson, R., Saunders, B. E., Nichols, T., Barnett, D., Zeanah, C., Berliner, L., Egeland, B., Newman, E., Lyon, T., LeTourneau, E., & Miller-Perrin, C. (2006). Report of the APSAC task force on attachment therapy, reactive attachment disorder, and attachment problems. *Child maltreatment*, *11*(1), 76–89. https://doi.org/10.1177/1077559505283699

Clarke-Stewart, K. A., & Hayward, C. (1996). Advantages of father custody and contact for the psychological well-being of school-age children. *Journal of Applied Developmental Psychology, 17*(2), 239-270.

Fraley, R. C. (2002). Attachment Stability from Infancy to Adulthood: Meta-Analysis and Dynamic Modeling of Developmental Mechanisms. *Personality and Social Psychology Review, 6*(2), 123–151.

Hofferth, S. L. (2006). Residential father family type and child well-being: Investment versus selection. *Demography, 43*(1), 53-77.

Hoffmann, J. P. (2002). The community context of family structure and adolescent drug use. *Journal of Marriage and Family, 64*(2), 314-330.

Kraemer, G. W. (1992). A psychobiological theory of Attachment. *Behavioral and Brain Sciences, 15,* 493-541.

Lawrence, C. R., Carlson, E. A., & Egeland, B. (2006). The impact of foster care on development. *Development and psychopathology*, *18*(1), 57-76.

Main, M., & Goldwyn, R. (1985). *Adult Attachment scoring and classification system*. Unpublished manuscript, Department of Psychology, University of California, Berkeley.

Main, M., Goldwyn, R., & Hesse, E. (2002). *Adult Attachment scoring and classification systems*. Unpublished manuscript, Department of Psychology, University of California, Berkeley.

Özcan, N. K., Boyacıoğlu, N. E., Enginkaya, S., Bilgin, H., & Tomruk, N. B. (2016). The relationship between Attachment styles and childhood trauma: a transgenerational perspective–a controlled study of patients with psychiatric disorders. *Journal of Clinical Nursing*, *25*(15-16), 2357-2366.

Pederson, D. R., & Moran, G. (1995). A categorical description of infant-mother relationships in the home and its relation to Q-sort measures of infant-mother interaction. *Monographs of the Society for Research in Child Development*, *60*(2-3), 111-132. doi:10.2307/1166174

Porges, S. W., Doussard-Roosevelt, J. A., & Maiti, A. K. (1994). Vagal tone and the physiological regulation of emotion. In N. A. Fox (Ed.), *the development of emotion regulation: Biological and behavioral considerations.  Monographs of*

Copyright © | Dr. Brooks McKenzie | LBH Research & Consulting, LLC

Do not reproduce in any form without written permission.

the Society for Research in Child Development, 59* (Serial No. 240, Nos. 2-3, pp. 167-186).

Purvis, K. B., McKenzie, L., Kellermann, G., & Cross, D. R. (2010). An Attachment based approach to child custody evaluation: A case study. *Journal of Child Custody: Research, Issues, and Practices*, *7*(1), 45-60. doi:10.1080/15379410903554832

Rutter, M., Kumsta, R., Schlotz, W., & Sonuga-Barke, E. (2012). Longitudinal studies using a "natural experiment" design: The case of adoptees from Romanian institutions. *Journal of the American Academy of Child & Adolescent Psychiatry*, *51*(8), 762-770. doi:10.1016/j.jaac.2012.05.011

Rutter, M., & O'Connor, T. G. (2004). Are there biological programming effects for psychological development? Findings from a study of Romanian adoptees. *Developmental psychology*, *40*(1), 81.

Schneider, R., Baumrind, N., Pavao, J., Stockdale, G., Castelli, P., Goodman, G. S., & Kimerling, R. (2009). What happens to youth removed from parental care?: Health and economic outcomes for women with a history of out-of-home placement. Children and Youth Services Review, 31(4), 440-444.Schore, A. N. (1994). Affect regulation and the origin of the self: The Neurobiology of emotional development. Hillsdale, NJ: Lawrence Erlbaum Associates.

Schore, A. N. (2001). Effects of a secure Attachment relationship on right brain development, affect regulation, and infant mental health. *Infant Mental Health Journal, 22(1–2),* 7–66.

Schore, A. N. (2003). *Affect regulation and disorders of the self.* New York: W. W. Norton.

Siegel, D. J. (1999). *The developing mind*. New York: Guilford.

Simpson, J. A. (1999). Attachment theory in modern evolutionary perspective. In Cassidy, J., & Shaver, P. R.  (Eds.), *Handbook of Attachment: Theory, research, and clinical applications* (pp. 115-140). New York: Guilford.

Sroufe, L., Egeland, B., & Kreutzer, T. (1990). The fate of early experience following developmental change: Longitudinal approaches to individual adaptation in childhood. *Child Development*, *61*(5), 1363-1373. doi:10.2307/1130748

Suomi, S. J. (1999). Attachment in Rhesus monkeys. In J. Cassidy & P. R. Shaver (Eds.), *Handbook of Attachment: Theory, research, and clinical applications* (pp. 181-197). New York: Guilford.

Copyright © | Dr. Brooks McKenzie | LBH Research & Consulting, LLC

Do not reproduce in any form without written permission.

CONFIDENTIAL USE ONLY

*RE:* O'Connor

U.S. Census Bureau (USCB; 2011), Children's Living Arrangements and Characteristics: March 2011, Table C8. Washington D.C.: 2011.

U.S. Department of Health and Human Services (USDHHS; 1993). National Center for Health Statistics. Survey on Child Health. Washington, DC, 1993.

US Department of Health and Human Services. (UDDHHS; 2009). Risk and protective factors for mental, emotional and behavioral disorders across the life cycle.

U.S. Department of Health and Human Services (USDHHS; 2012); ASEP Issue Brief: Information on Poverty and Income Statistics. September 12, 2012 http://aspe.hhs.gov/hsp/12/PovertyAndIncomeEst/ib.shtml

van den Dries, L., Juffer, F., van IJzendoorn, M. H., & Bakermans-Kranenburg, M. J. (2009). Fostering security? A meta-analysis of Attachment in adopted children. *Children and Youth Services Review*, 31(3), 410-421. doi:10.1016/j.childyouth.2008.09.008

van IJzendoorn M. H. (1995). Adult Attachment representations, parental responsiveness, and infant Attachment: a meta-analysis on the predictive validity of the Adult Attachment Interview. *Psychological bulletin*, *117*(3), 387–403. https://doi.org/10.1037/0033-2909.117.3.387

van Ijzendoorn, M. H., Schuengel, C., & Bakermans-Kranenburg, M. J. (1999). Disorganized Attachment in early childhood: Meta-analysis of precursors, concomitants, and sequelae. *Development and Psychopathology*, *11*(2), 225-249. doi:10.1017/S0954579499002035

van Zeijl, J., Mesman, J., van IJzendoorn, M. H., Bakermans-Kranenburg, M. J., Juffer, F., Stolk, M. N., & … Alink, L. A. (2006). Attachment-based intervention for enhancing sensitive discipline in mothers of 1- to 3-year-old children at risk for externalizing behavior problems: A randomized controlled trial. *Journal of Consulting and Clinical Psychology*, *74*(6), 994-1005. doi:10.1037/0022-006X.74.6.994

Verhage, M. L., Schuengel, C., Madigan, S., Fearon, R., Oosterman, M., Cassibba, R., Bakermans-Kranenburg, M. J., & van IJzendoorn, M. H. (2016). Narrowing the transmission gap: A synthesis of three decades of research on intergenerational transmission of attachment. *Psychological bulletin*, *142*(4), 337–366. https://doi.org/10.1037/bul0000038

Waters, E. (1987) Attachment Q-set (Version 3). Retrieved May 1, 2013 from http://www.johnbowlby.com

Copyright © | Dr. Brooks McKenzie | LBH Research & Consulting, LLC

Do not reproduce in any form without written permission.

Waters, E. (1995). The Attachment Q-set (Version 3.0). *Monographs of The Society for Research in Child Development*, *60*(2-3), 234-246. doi: 10.1111/j.1540-5834.1995.tb00214.x

Zeanah, C. H., Berlin, L. J., & Boris, N. W. (2011). Practitioner review: Clinical applications of Attachment theory and research for infants and young children. *Journal of Child Psychology and Psychiatry, 52*(8), 819-833. doi:10.1111/j.1469-7610.2011.02399.x

Copyright © | Dr. Brooks McKenzie | LBH Research & Consulting, LLC

Do not reproduce in any form without written permission.

**CONFIDENTIAL USE ONLY**

*RE:* O'Connor

## F) Qualifications of Evaluator

All assessments, scoring, interpretation, and written reports were completed by Dr. L. Brooks McKenzie. Dr. McKenzie is a holds a Bachelor of Science in Psychology from Southwest Texas State University, a Master of Arts in Clinical Psychology from Cardinal Stritch University, and a Doctorate of Psychology from Texas Christian University (TCU), with an emphasis in Experimental and Developmental Psychology, and Attachment theory. Additionally, Dr. McKenzie interned six (6) months with the Wisconsin Forensic Unit, is a 4-way certified rater of the Adult Attachment Interview (see Appendix B), and held the position of Assistant Director of Research for the TCU Institute of Child Development. See Appendix C for Curricula Vitae of Dr. McKenzie.

Copyright © | Dr. Brooks McKenzie | LBH Research & Consulting, LLC

Do not reproduce in any form without written permission.

**CONFIDENTIAL USE ONLY**

*RE:* O'Connor

## Appendix A: Formal AAI Scores Dr. O'Connor 01/29/2022

| *Scales Scored For Experience* | Mother | Father |
|---|---|---|
| Rejecting | 3 | 2 |
| Involving/Role Reversal | 5 | 3 |
| Pressure to Achieve | 2 | 4 |
| Neglecting | 1 | 3 |
| Loving | 5 | 5 |

| *Experiences Present/absent* | |
|---|---|
| Abuse-Sexual | N/A |
| Abuse-Physical | N/A |
| Other Abuse/Extreme Events | N/A |
| Does Speaker have children? | Yes |

| *States of Mind Respecting Parents* | Mother | Father |
|---|---|---|
| Idealizing | 3 | 4 |
| Involving Anger | 1 | 1 |
| Derogation | 1 | 1 |

Copyright © | Dr. Brooks McKenzie | LBH Research & Consulting, LLC

Do not reproduce in any form without written permission.

CONFIDENTIAL USE ONLY

*RE:* O'Connor

### *Scales for Overall States of Mind*

| | |
|---|---|
| Overall Derogation of Attachment | 1 |
| Insistence on Lack of Recall | 3 |
| Metacognitive Processes | 6 |
| Passivity of Thought Processes | 4 |
| Fear of Loss | 1 |
| Highest Score for Unresolved Loss | 1 |
| Highest Score for Unresolved Trauma | 1 |
| OVERALL "U" Score (highest) | 1 |
| Highest Score for "Other" Trauma | 1 |
| | |
| Coherence of Transcript | 6 |
| Coherence of Mind | 6 |

**CLASSIFICATION:**   F-General Secure/Autonomous with respect to Attachment

Copyright © | Dr. Brooks McKenzie | LBH Research & Consulting, LLC

Do not reproduce in any form without written permission.

CONFIDENTIAL USE ONLY
*RE:* O'Connor

# Appendix B: Adult Attachment Interview Certification

UNIVERSITY OF CALIFORNIA, BERKELEY

BERKELEY • DAVIS • IRVINE • LOS ANGELES • MERCED • RIVERSIDE • SAN DIEGO • SAN FRANCISCO        SANTA BARBARA • SANTA CRUZ

DEPARTMENT OF PSYCHOLOGY                    BERKELEY, CALIFORNIA 94720-1650
3210 TOLMAN HALL # 1650                     TEL: (510) 642-5292

January 2, 2009

Lewis Brooks McKenzie
3015 Cockrell Ave
Apt. 5
Fort Worth, TX 76109

Dear Lewis Brooks McKenzie,

 We are delighted to congratulate you on having completed and passed the full 30-case reliability testing for the analysis of the Adult Attachment Interview.

 You have been found highly reliable across 30 cases in sequence whether we consider a three-category analysis (the Dismissing, Secure and Preoccupied adult attachment categories), or whether the fourth, Unresolved/disorganized category is considered as well.

 This represents an outstanding accomplishment, and we look forward to learning about your forthcoming work with this instrument.

/Mary Main/                                  Erik Hesse

Copyright © | Dr. Brooks McKenzie | LBH Research & Consulting, LLC

Do not reproduce in any form without written permission.

**CONFIDENTIAL USE ONLY**

*RE:* O'Connor

# Appendix C: Curriculum Vitae – Dr. L. Brooks McKenzie

## Employment

*LBH Research & Consulting, LLC, Fort Worth, Texas*                    **2013 - Present**

**President**

*Independent Consulting & Research, Specializing in Attachment Measures and Training*
- Specialize in working with agencies (e.g., non-profits, family courts, etc.) that serve at-risk children. Provide TBRI® training to organizations and families, provide Attachment assessments (AAI, AQS) of adults and children. Provide expert witness testimony.

*Grand Canyon University*                                             **2017 - 2018**

**Dissertation Chair**

Online Dissertation Chair
- Mentor and oversee dissertation process for graduate students

*DCCCD, Dallas, Texas*                                                **2014 - 2016**

**Adjunct Faculty**

Campus and Dual-Credit Adjunct Faculty
- Adjunct Psychology Faculty

*Texas Christian University, Fort Worth, Texas*                        **2012 - 2013**

**Assistant Director of Research**

**TCU Institute of Child Development**
- Administrative and collaborative oversight of all research, research staff, and training activities; TBRI® based research and training.

*Texas Christian University, Fort Worth, Texas*                        **2011 - 2012**

**Research Scientist**

**TCU Institute of Child Development**
- TBRI® researcher and trainer.

Copyright © | Dr. Brooks McKenzie | LBH Research & Consulting, LLC

Do not reproduce in any form without written permission.

**CONFIDENTIAL USE ONLY**

*RE:* O'Connor

| | |
|---|---|
| *Texas Christian University, Fort Worth, Texas* | **2006 - 2010** |

**PhD Candidate and Teaching/Research Assistant**
- PhD candidate with research and teaching load.

| | |
|---|---|
| *Dallas MetroCare, Dallas, Texas* | **2005 - 2006** |

**Special-Needs Offender Program**
- Case manager for high-risk offenders.

| | |
|---|---|
| *Center for Comprehensive Services, Carbondale, Illinois* | **2004 - 2005** |

**Rehabilitation Specialist**
- Directed psychological interventions for residents who suffered traumatic brain injury.

## Education

| | |
|---|---|
| Texas Christian University, Fort Worth, Texas | **2010** |

**Ph.D. - Experimental Psychology**

Emphasis: Developmental Psychology

Expertise: Attachment Theory, Adult and Child Attachment

Dissertation: *Development of an Adult Attachment Scale*

| | |
|---|---|
| Cardinal Stritch University, Milwaukee, Wisconsin | **2004** |

**M.A. in Clinical Psychology; Psi Chi Membership**

Thesis: *Measures of Self-Esteem, Self-Efficacy, Locus of Control and Depression within the Low-Income Population in Milwaukee, Wisconsin*

**\*9 months as Forensic Intern with Wisconsin Forensic Unit**

| | |
|---|---|
| Southwest Texas State University, San Marcos, Texas | **2001** |

**B.S. in Psychology; Cum Laude**

Major: Psychology

Minor: Philosophy

Copyright © | Dr. Brooks McKenzie | LBH Research & Consulting, LLC

Do not reproduce in any form without written permission.

**CONFIDENTIAL USE ONLY**

*RE:* O'Connor

## Select Publications

Purvis, K., Cross, D., Federici, R., Johnson, D., & McKenzie, L. B. (2007). The Hope Connection: a therapeutic summer day camp for adopted and at-risk children with special socio-emotional needs. *Adoption & Fostering*, *31*(4), 38-48.

Cross, D. R., Kellermann, G., McKenzie, L. B., Purvis, K. B., Hill, G. J., & Huisman, H. G. (2010). A randomized targeted amino acid therapy with behaviourally at-risk adopted children. *Child: Care, Health and Development,* 37, 671–678.

Purvis, K. B., McKenzie, L. B., Kellermann, G., & Cross, D. R. (2010). An Attachment based approach to child custody evaluation: A case study. *Journal of Child Custody, 7,* 45-60.

Howard, A. R., Call, C. D., McKenzie, L. B., Hurst, J. R., Cross, D. R, & Purvis, K. P. (2013). An examination of Attachment representations among child welfare professionals. *Children & Youth Services Review,* 35, 1587-1591.

Purvis, K. B., McKenzie, L. B., Cross, D. R., & Razuri, E. B. (2013). A spontaneous emergence of Attachment behavior in at-risk children and a correlation with sensory deficits. *Journal of Child and Adolescent Psychiatric Nursing, 26*(3), 165-172.

McKenzie, L. B., Purvis, K. B., & Cross, D. R. (2014). A Trust-Based Home Intervention for Special-Needs Adopted Children: A Case Study. *Journal of Aggression, Maltreatment & Trauma, 23*(6), 633-651.

Purvis, K. B., Cross, D. R., McKenzie, L. B., Razuri, E. B., & Buckwalter, K. (2014). A Trust-Based Intervention for Complex Developmental Trauma: A Case Study from a Residential Treatment Center. *Child and Adolescent Social Work Journal, 31*(4), 355-368.

## Presentations

McKenzie, L. B. (2014, October). Attachment and Child Development. Paper presented at the Tarrant County Family Law Bar Association, Fort Worth, Texas.

McKenzie, L. B., & Cross, D. R. (2008, September). Preliminary Report: Evidence Based Practices for Tarrant County. Paper presented at the Bridging the Gap Symposium, Fort Worth, Texas.

McKenzie, L. B. & Kowalchuk, R. K. (2004, November). Psychological Well-Being Within a Low-Income Mid-Western Sample. Paper presented at the meeting of the International Conference for Social Science Research, New Orleans, LA.

## Unpublished Manuscripts

Copyright © | Dr. Brooks McKenzie | LBH Research & Consulting, LLC

Do not reproduce in any form without written permission.

Cross, D. R., McKenzie, L. B., Freisen-Swan, M., Nakata, T., & Purvis, K. B. (2010). *Attachment Stability and Change from 12- to 19-months: A Log-Linear Meta-analysis*. Unpublished manuscript, Texas Christian University, Fort Worth, Texas.

McKenzie, L. B. (2004). *Measures of Self-Esteem, Self-Efficacy, Locus of Control and Depression within the Low-Income Population in Milwaukee, Wisconsin* (Unpublished master's thesis). Cardinal Stritch University, Milwaukee, WI.

McKenzie, L. B. (2010). *Development of an Adult Attachment Scale: Preliminary Study* (Unpublished doctoral dissertation). TCU, Fort Worth, Texas.

McKenzie, L. B., Cross, D. R., & Purvis, K. B. (2009). *Differences in Parental CBCL Ratings and Neurotransmitter Profiles for 30 Children: Are Differences Indicative of Dysfunction*? Unpublished manuscript, Texas Christian University, Fort Worth, Texas.

Purvis, K. B., McKenzie, L. B., Rus, A. V., & Cross, D. R. (2011). *A Brief Report of Neurochemical Profiles for 28 Romanian Infants Raised in either Institutional or Biological Settings*. Unpublished manuscript, Texas Christian University, Fort Worth, Texas.

## Specializations - Other

**Adult Attachment Interview (AAI) -** Certified (4-way) to administer and score the Adult Attachment Interview by Mary Main, PhD; scored and coded ~3000 AAI transcripts for research, non-profits, various therapeutic organizations, individuals, and child custody evaluations.

**Trust-Based Relational Intervention® (TBRI®) -** Extensive knowledge (10+ years) of Trust-Based Relational Intervention® (TBRI®), a program developed by the TCU Institute of Child Development (ICD). TBRI® is an Attachment based intervention for children and families, designed to address the developmental needs of at-risk children.

**Specialized Training/Skills-** Nine months experience as forensic intern with Wisconsin Forensic Unit.

**Other-** Serve as expert witness in child custody placement proceedings, employing Adult Attachment Interview and Attachment Q-sort (valid, reliable measures) in order to measure health of Attachment relationships.

Copyright © | Dr. Brooks McKenzie | LBH Research & Consulting, LLC

Do not reproduce in any form without written permission.